## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **BRITTANY N. FLEENOR,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:18cv00016 |
| | ) | **REPORT AND** |
| **ANDREW SAUL,**[1] | ) | **RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | By:   PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

### *I. Background and Standard of Review*

Plaintiff, Brittany N. Fleenor, ("Fleenor"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011 & Supp. 2019). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). Neither party has requested oral argument. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted for Nancy A. Berryhill as the defendant in this case.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Fleenor protectively filed her application for DIB on July 30, 2010, alleging disability as of July 14, 2010, based on multiple sclerosis; depression; a learning disability; poor memory and concentration; inability to walk due to numbness and weakness in the legs; and severe back pain. (Record, ("R."), at 17, 172-73, 240, 250.) The claim was denied initially and upon reconsideration. (R. at 87-89, 95, 98-100.) Fleenor then requested a hearing before an administrative law judge, ("ALJ"). (R. at 102-03.) The ALJ held a hearing on September 25, 2012, at which Fleenor was represented by counsel. (R. at 36-60.) By decision dated October 3, 2012, the ALJ denied Fleenor's claim. (R. at 17-29, 1009-21.) After the ALJ issued his decision, Fleenor pursued her administrative appeals, (R. at 13), but the Appeals Council denied her request for review. (R. at 1-8.) Fleenor then filed an action seeking review of the ALJ's unfavorable decision with this court.[2] (R. at 1039-43.) By order dated March 29, 2016, this court remanded Fleenor's case to the Commissioner for further consideration. (R. at 1045-53.) Upon remand, the ALJ held a second hearing on August 25, 2016, at which Fleenor was represented by counsel. (R. at 972-1004.)

By decision dated October 12, 2016, the ALJ again denied Fleenor's claim. (R. at 923-59.) The ALJ found that Fleenor met the nondisability insured status

---

[2] Fleenor filed her Complaint with this court on May 30, 2014, under the name Brittany N. Worley. *See Worley v. Colvin*, Civil Action No. 1:14cv00020.

requirements of the Act for DIB purposes through March 31, 2014. (R. at 926.) The ALJ found that Fleenor had not engaged in substantial gainful activity from July 14, 2010, the alleged onset date, through the date last insured.[3] (R. at 926.) The ALJ found that, through the date last insured, Fleenor had severe impairments, namely idiopathic neuropathy; obesity; bipolar disorder; major depressive disorder; anxiety disorder; post-traumatic stress disorder, ("PTSD"); borderline personality disorder; and conversion disorder, but he found that Fleenor did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 926-27.)

The ALJ found that, through the date last insured, Fleenor had the residual functional capacity to perform sedentary work.[4] (R. at 930.) The ALJ found that Fleenor could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently; stand and/or walk for a total of two hours in an eight-hour workday and sit for a total of six hours in an eight-hour workday; occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl, but never climb ladders, ropes or scaffolds; frequently operate foot controls; she should avoid concentrated exposure to vibration and even moderate exposure to hazards, such as machinery or heights; she could perform simple, routine, repetitive tasks in a low-stress job, which was defined as requiring only occasional decision making or changes in the work setting; and she could have only occasional interaction with the public and co-

---

[3] Therefore, Fleenor must show that she was disabled between July 14, 2010, the alleged onset date, and March 31, 2014, the date last insured, in order to be eligible for benefits.

[4] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2019).

workers. (R. at 930.) The ALJ found that Fleenor had no past relevant work. (R. at 957.) Based on Fleenor's age, education, work history and residual functional capacity, and the testimony of a vocational expert, the ALJ found that, through the date last insured, a significant number of jobs existed in the national economy that Fleenor could perform, including jobs as an office helper, a handler/sealer/packer and an inspector/tester. (R. at 957-58.) Thus, the ALJ concluded that, through the date last insured, Fleenor was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 959.) *See* 20 C.F.R. § 404.1520(g) (2019).

After the ALJ issued his decision, Fleenor pursued her administrative appeals, (R. at 913), but the Appeals Council denied her request for review. (R. at 909-11.) Fleenor then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2019). This case is before this court on Fleenor's motion for summary judgment filed January 17, 2019, and the Commissioner's motion for summary judgment filed February 25, 2019.

## II. Facts[5]

Fleenor was born in 1986, (R. at 172, 979), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). Fleenor completed three years of college and has past work experience as a personal care assistant, a customer service

---

[5] As noted above, Fleenor must show that she was disabled between July 14, 2010, the alleged onset date, and March 31, 2014, the date last insured, in order to be eligible for benefits. Therefore, the court will address the medical evidence pertaining to this time period. Due to the length of the record, the court adopts the facts as thoroughly discussed in the ALJ's decision. Any post-date last insured evidence is discussed only to the extent it is useful for evaluation of Fleenor's impairments and functional status during the relevant period.

representative, a waitress and a cashier. (R. at 199, 241.) At her 2016 hearing, Fleenor testified that she had difficulty standing and walking six to seven days a month and had to use a wheelchair. (R. at 982.) She testified that she had mood swings and anger issues. (R. at 985.)

Barry Hensley, a vocational expert, also was present and testified at Fleenor's 2016 hearing. (R. at 993-1001.) Hensley was asked to consider a hypothetical individual of Fleenor's age, education and work history, who could perform simple, routine, repetitive work that did not require lifting items weighing more than 20 pounds occasionally and 10 pounds frequently; that would not require the individual to stand or walk for more than two hours in an eight-hour workday and sit for more than six hours in an eight-hour workday; that did not require climbing of ladders, ropes or scaffolds; that did not require more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; that did not require more than frequent operation of foot controls; that did not require concentrated exposure to vibration and even moderate exposure to hazards, such as moving machinery and heights; and that required no more than occasional decision making or changes in the work setting and occasional interaction with the public and co-workers. (R. at 993-94.) Hensley testified that this hypothetical ranged between sedentary and light[6] work. (R. at 994.) He stated that there were jobs available at the light level of exertion that such an individual could perform, including jobs as an office helper. (R. at 994.) Hensley stated that jobs at the sedentary level included jobs as a handler, sealer and packer and an inspector and tester. (R. at 994.) Hensley

---

[6] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2019).

stated that there would be no jobs available should the same hypothetical individual be unable to stoop, kneel, crouch or crawl. (R. at 995.)

Next, Hensley was asked to consider hypothetical individual number one, but who would be absent from work once a week and who would require the use of an assistive device, such as a walker or a wheelchair. (R. at 995.) Hensley stated that the absentee rate would be too high for competitive work. (R. at 996.) He stated that, in terms of the assistive device, a single-point cane still could be used for certain types of light work and for most forms of sedentary work, but a walker required a doctor's prescription and an employer's concession. (R. at 996.) Hensley then was asked to consider hypothetical individual number one, but who could balance, stoop, crouch and crawl less than occasionally. (R. at 996.) He stated that light work would be precluded, but the hypothetical individual could perform sedentary work. (R. at 996.) Hensley was asked to consider hypothetical individual number one, but who would have a serious problem demonstrating reliability and maintaining attention and concentration, who had no useful ability to deal with the public, to behave in an emotionally stable manner and who would miss two days or more per month. (R. at 999, 1001.) He stated that the absentee rate would be too great for competitive work. (R. at 1001.) He also stated that there would be no jobs available should the individual be restricted from squatting, stooping, crouching and crawling. (R. at 1001.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Dr. Bert Spetzler, M.D., a state agency physician; Dr. Shirish Shahane, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Norton Community Hospital; Wellmont-Bristol Regional, ("Bristol Regional"); Stone Mountain Health Services, ("Stone Mountain"); Frontier Health; B. Wayne

Lanthorn, Ph.D., a licensed clinical psychologist; University of Virginia Health System, ("UVA"); Dr. Kevin Blackwell, D.O.; Holston Medical Group; Dr. Douglas A. Wright, M.D.; Dr. Christopher M. Basham, M.D.; Dr. Paul L. Jett, M.D.; Dr. Uzma Ehtesham, M.D., a psychiatrist; Appalachia Family Health Clinic, ("Appalachia Family"); and Paige Cordial, Psy.D.

Fleenor's high school records show that she participated in an individualized education program, ("IEP"). (R. at 302-17.) Fleenor took all classes in a regular classroom setting, with monitoring by special education staff to provide additional support as needed. (R. at 303, 311-12.) Fleenor received special services to deal with feelings of inadequacy, anxiety and apprehension. (R. at 304, 312-13.) According to the IEP, Fleenor functioned within the average range of intellectual ability. (R. at 304, 315.)

On February 28, 2010, Fleenor presented to the emergency room for complaints of headache with burning pain over the right side of the forehead. (R. at 2010-11.) A CT scan of Fleenor's head showed no acute intracranial lesions, but an incidental finding of soft tissue density in the right maxillary sinus was suggestive of a retention cyst. (R. at 466.) Examination showed grossly normal neurological findings, and she had normal sensation, motor function and reflexes. (R. at 2011.) Fleenor was diagnosed with a headache. (R. at 2011.)

On June 23, 2010, Fleenor established care at Stone Mountain. (R. at 649.) She complained of a sore throat, and there were no reported musculoskeletal or neurological symptoms. (R. at 649-50.) Examination showed normal gait and station, cranial nerves, orientation, mood and affect. (R. at 650.) In July 2010, Fleenor complained of lower back pain and numbness and tingling in the lower legs.

(R. at 640, 643, 646.) Fleenor presented for examination in a wheelchair. (R. at 640, 643.) Despite these complaints, x-rays of Fleenor's lumbar spine were normal. (R. at 652.)

On July 21, 2010, Fleenor was admitted to Bristol Regional for complaints of bilateral lower extremity weakness and numbness, urinary incontinence and history of multiple sclerosis. (R. at 583-624.) MRIs of Fleenor's thoracic and cervical spine were normal. (R. at 611-12.) An MRI of Fleenor's lumbar spine showed mild bulges associated with small central disc herniations with minimal mass effect at the L5-S1 levels. (R. at 610.) An MRI of Fleenor's head showed a right maxillary sinus mucous retention cyst. (R. at 613.) Examination showed that Fleenor's speech, language and vocabulary were normal; she had 3/3 recall of unrelated items; she was able to move her arms normally with symmetric strength; she would not move her legs, however, she had 5/5 muscle strength and normal tone and bulk; she could perform finger-to-nose maneuvers adequately; she described diminished sensation from the umbilicus down; she had absent vibratory sense and proprioception in her legs; and she had no abnormal movements or posturing. (R. at 590.) A somatosensory evoked potential test of Fleenor's tibial nerves showed the possibility of peripheral nerve compromise. (R. at 623.) Fleenor was diagnosed with history of "multiple sclerosis" and give-away leg weakness. (R. at 591.)

On August 13, 2010, Fleenor presented to Stone Mountain in a wheelchair, accompanied by her mother. (R. at 660.)  Examination showed positive tenderness to palpation in the lumbar spine and paraspinals and positive straight leg raising tests bilaterally, and she had a normal mood and affect. (R. at 661.)  The examiner noted that Fleenor jumped on examination and appeared to have an "exaggerated response." (R. at 661.) On September 27, 2010, Fleenor was able to walk with slight

assistance from her mother. (R. at 657.) It was again noted that Fleenor exhibited an "exaggerated response" on physical examination, particularly to spinal palpation. (R. at 658.)

On December 17, 2010, Dr. Kevin Blackwell, D.O., examined Fleenor at the request of Disability Determination Services. (R. at 832-36.) Dr. Blackwell reported that Fleenor was in no acute distress; she had good mental status; she had an unstable gait; she had decreased sensation in the lower extremities bilaterally; she had tenderness in the lumbar musculature; her upper and lower joints were with no effusion or obvious deformities and all extremities were normal for size, shape, symmetry and strength; her grip strength was good; her fine motor movement skill activities of the hands were normal; her reflexes were within normal limits; and range of motion was within normal limits. (R. at 834, 836.) Dr. Blackwell diagnosed chronic low back pain; possible multiple sclerosis, by history; and depression. (R. at 834.) Dr. Blackwell found that Fleenor could lift items weighing up to 35 pounds occasionally and up to 15 pounds frequently; sit for eight hours in an eight-hour workday; stand for up to two hours in an eight-hour workday; bend and kneel up to one-third of the day; she should avoid working around unprotected heights; she should never climb ladders; and she should avoid operating foot pedals continuously. (R. at 835.)

On December 28, 2010, Dr. Bert Spetzler, M.D., a state agency physician, completed a medical assessment, finding that Fleenor could perform light work. (R. at 66-68.) He found that Fleenor had a limited ability to push and/or pull with her lower extremities. (R. at 67.) Dr. Spetzler found that Fleenor could frequently stoop; occasionally climb ramps and stairs, balance, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds. (R. at 67.) No manipulative, visual or

communicative limitations were noted. (R. at 67.) Dr. Spetzler opined that Fleenor should avoid concentrated exposure to vibration and avoid even moderate exposure to hazards, such as machinery and heights. (R. at 68.)

On December 30, 2010, Fleenor was seen by Kellie W. Brooks, N.P., a nurse practitioner with Stone Mountain, to establish care.[7] (R. at 720-21.) Fleenor no longer used a walker or a cane to ambulate. (R. at 721.) Examination showed grossly normal findings. (R. at 720.) On February 2, 2011, Fleenor had normal gait, station and stability. (R. at 717.) She presented with normal orientation, memory, mood, affect, judgment and insight. (R. at 717.)

On February 21, 2011, Fleenor was evaluated at Frontier Health upon referral from her attorney. (R. at 688-90.) Fleenor reported abusive relationships in the past and that she had recently separated from her second husband. (R. at 688.) She endorsed frequent mood shifts, crying spells and panic attacks since the deaths of her children at 24 weeks of age and ongoing difficulty dealing with their deaths. (R. at 688.) Fleenor reported episodes of anger towards her ex-husband and admitted to "bashing his head up against the wall" for something that he said. (R. at 690.) Fleenor was diagnosed with depressive disorder and borderline personality disorder. (R. at 689.) Her then-current Global Assessment of Functioning, ("GAF"),[8] score was

---

[7] It is noted that Fleenor was seen by Brooks at the St. Charles Community Health Clinic of Stone Mountain. (R. at 720-21.) She previously received treatment at the Haysi Clinic of Stone Mountain. (R. at 721.)

[8] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

assessed at 50,[9] with her highest GAF score being 55[10] and her lowest GAF score being 50 within the past six months. (R. at 689.) Examinations throughout 2011 showed that Fleenor was oriented; she had intact thought process; her mood ranged from euthymic to irritable with a congruent affect; her speech was clear and goal-directed;[11] and she was dressed appropriately. (R. at 691-96, 698, 743-46.) Fleenor reported that she spent time with friends and family and that she was dating various people. (R. at 693, 698, 743, 746.) During examinations between February and May 2011,[12] Fleenor's gait and station were normal; she had normal sensation; her mood was labile with a congruent affect; she was dressed appropriately and was neatly groomed; she made good eye contact; and she had intact thought process. (R. at 698-99, 708, 711, 714, 717.)

On July 13, 2011, Dr. Shirish Shahane, M.D., a state agency physician, completed a medical assessment, finding that Fleenor could perform light work. (R. at 80-82.) Dr. Shahane found that Fleenor had a limited ability to push and/or pull with her lower extremities. (R. at 80.) Dr. Shahane found that Fleenor could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds. (R. at 80-81.) No manipulative, visual or

---

[9] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning…." DSM-IV at 32.

[10] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

[11] In July and August 2011, Fleenor's speech was pressured. (R. at 744, 746.)

[12] On April 14, 2011, Fleenor seemed irritable and presented with pressured speech as she described an altercation with her father. (R. at 696.) Her mental status was otherwise intact. (R. at 696.) Fleenor reported that medication helped alleviate her pain. (R. at 696.) Subsequent mental status examinations showed grossly normal findings, apart from an occasional depressed, agitated or anxious mood. (R. at 691-95, 743.)

communicative limitations were noted. (R. at 81.) Dr. Shahane opined that Fleenor should avoid concentrated exposure to vibration and avoid even moderate exposure to hazards, such as machinery and heights. (R. at 81.)

On July 15, 2011, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Fleenor had mild restrictions in her activities of daily living; had no difficulties in maintaining social functioning; had mild difficulties maintaining concentration, persistence or pace; and had experienced no repeated episodes of extended-duration decompensation. (R. at 78-79.)

On October 25, 2011, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Fleenor at the request of Fleenor's attorney. (R. at 748-58.) Fleenor reported multiple forms of abuse beginning at the age of 13 when she was raped by three boys and, also physically and verbally abused by both of her ex-husbands. (R. at 758.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Fleenor obtained a full-scale IQ score of 71. (R. at 749.) Fleenor stated that she spent a lot of time on her computer; washed laundry; did some cooking and cleaning; occasionally went to the grocery store; socialized with family; and occasionally watched television. (R. at 752-53.) Lanthorn reported that Fleenor had an odd gait; she had clear and intelligible speech; she displayed no delusional thinking; her eye contact was erratic; she had a depressed and agitated mood; she had low self-esteem; she was able to recall four out of five words; she correctly performed Serial 7s; she correctly interpreted two out of three commonly used adages; and she correctly spelled the word "world" both forwards and backwards. (R. at 753-54.) Lanthorn diagnosed major depressive disorder, recurrent, severe with psychotic features; chronic PTSD; pain disorder associated

with both psychological factors and general medical conditions, chronic; borderline intellectual functioning; and personality disorder, not otherwise specified. (R. at 757.) Lanthorn assessed Fleenor's then-current GAF score at 45. (R. at 758.)

Lanthorn completed a mental assessment, indicating that Fleenor had a satisfactory ability to understand, remember and carry out simple job instructions. (R. at 759-61.) He found that Fleenor had a seriously limited ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment in public; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out detailed job instructions; to maintain personal appearance; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 759-60.) Lanthorn opined that Fleenor had no useful ability to understand, remember and carry out complex job instructions. (R. at 760.) He found that Fleenor had the capability to manage her own funds. (R. at 761.) Lanthorn opined that Fleenor would be absent from work more than two days a month. (R. at 761.)

On March 23, 2012, Fleenor was seen at UVA for follow up of her complaints of transient weakness and sensory changes. (R. at 765.) Examination was entirely normal, other than brisk reflexes in the down-going toes; she was in no distress; she had a normal mood, affect and behavior; her language was fluent with intact comprehension; she had normal muscle bulk and tone; she had full power throughout; she had intact sensation; she had intact finger to nose and heel to shin bilaterally; and her gait was intact. (R. at 766.) Dr. Micaela Chatman, M.D., a neurology resident, noted that she was "not impressed by any evidence of sensory abnormality." (R. at 766.) Dr. Chatman ordered additional testing to rule out

neurosarcoidosis.[13] (R. at 766.) On April 7, 2012, an MRI of Fleenor's brain showed no evidence of neurosarcoidosis. (R. at 770.) An MRI of Fleenor's cervical and lumbar spine showed mild degenerative changes and no evidence of neurosarcoidosis. (R. at 773.)

On May 30, 2012, Bradon Bogle, M.A., a counselor with Stone Mountain, completed a mental assessment, indicating that Fleenor had an unlimited ability to maintain personal appearance and a satisfactory ability to understand, remember and carry out simple job instructions and to demonstrate reliability.[14] (R. at 786-88.) He found that Fleenor had a seriously limited ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment in public; to function independently; and to understand, remember and carry out detailed job instructions. (R. at 786-87.) Bogle opined that Fleenor had no useful ability to interact with supervisors; to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 786-87.) He found that Fleenor would be absent from work about two days a month. (R. at 788.)

---

[13] Neurosarcoidosis is a manifestation of sarcoidosis in the nervous system. Sarcoidosis is a chronic inflammatory disorder. *See* https://www.ninds.nih.gov/Disorders/All-Disorders/Neurosarcoidosis-Information-Page (last visited Jan. 29, 2020.)

[14] Between May 2012 and July 2013, Fleenor treated with Bogle. (R. at 824-26, 867-79.) Fleenor's reports varied from being content with her life and in a "happy bubbly mood" to being unable to stay present in the moment and feeling stress due to her physical health and situational factors. (R. at 824-26, 867-79.) Bogle's treatment notes contain no examination findings. (R. at 824-26, 867-79.)

On August 23, 2012, Fleenor reported problems with "anger issues, emotional fluctuations, self-esteem, self-pity and depression." (R. at 819.) Brooks diagnosed depressive disorder and borderline personality disorder. (R. at 820.) Fleenor's then-current GAF score was assessed at 53, with her highest GAF score being 60 and her lowest GAF score being 50 within the past six months. (R. at 820.) On August 31, 2012, Fleenor complained of feeling aggressive toward family members. (R. at 829.) She stated that she had stopped smoking and stopped consuming caffeine. (R. at 829.) Fleenor was considering starting a new romantic relationship. (R. at 829.) Fleenor's mood was happy, and her affect was congruent; her speech was clear and easy to understand; she dressed appropriately; and she made good eye contact. (R. at 829.) On September 7, 2012, Fleenor reported that Tylenol helped relieve her back pain. (R. at 846.) She had a normal station and gait, and her memory, mood, affect, judgment and insight were normal. (R. at 847.)

On September 12, 2012, Brooks completed a medical assessment, indicating that Fleenor could lift and carry items weighing up to 10 pounds occasionally and five pounds frequently; stand and/or walk a total of four hours in an eight-hour workday and do so for up to one hour without interruption; sit a total of four hours in an eight-hour workday and do so for up to one hour without interruption; and occasionally climb, stoop, kneel, balance, crouch and crawl. (R. at 838-40.) She found that Fleenor had a limited ability to reach, to handle, to feel and to push and pull. (R. at 839.) Brooks found that Fleenor was restricted from working around heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity and vibration. (R. at 840.) She opined that Fleenor would be absent from work more than two days a month. (R. at 840.)

On October 12, 2012, Dr. Stephen N. Donahue, M.D., a physician at UVA, reported that Fleenor had an appropriate affect, mood and behavior; her fluency and comprehension were normal; she had normal muscle bulk and tone; full power in all extremities; no involuntary movements; she had some decreased sensation on the left side; and she had normal reflexes, coordination and gait. (R. at 861.) Dr. Donahue reported that Fleenor's complaints of lower extremity weakness, numbness and tingling, which left her in a wheelchair for three months, were possibly related to stress, anxiety or migraine headaches, and were not neurological. (R. at 861.)

On December 13, 2012, Bogle completed a mental assessment, indicating that Fleenor had a satisfactory ability to function independently and to maintain personal appearance. (R. at 850-52.) He opined that Fleenor had a seriously limited ability to follow work rules; to relate to co-workers; to interact with supervisors; to maintain attention and concentration; to understand, remember and carry out detailed and simple job instructions; and to demonstrate reliability. (R. at 850-51.) Bogle found that Fleenor had no useful ability to deal with the public; to use judgment in public; to deal with work stresses; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 850-51.) He found that she would be absent from work more than two days a month. (R. at 852.)

On January 30, 2013, Fleenor reported continued daily headaches, but stated that they had become more bearable on the current dosage of Neurontin. (R. at 1193-94.) Fleenor's test results did not reveal anything consistent with multiple sclerosis. (R. at 1193.) On examination, Fleenor had full muscle strength, tone and bulk; normal coordination; normal gait, but some left-sided sensation deficits. (R. at 1196-97.) On February 13, 2013, Fleenor reported that she was being more active with her

brother and trying to exercise within her physical limitations. (R. at 870.) On follow up with Brooks on March 8, 2013, Fleenor stated that Neurontin was helping her pain and headaches. (R. at 1229.) Fleenor reported that she had been getting out more and driving. (R. at 1229.) Examination showed normal neck range of motion, normal gait and intact mental status. (R. at 1231.)

On September 17, 2013, Fleenor established care with Dr. James Louthan, M.D., a physician at Holston Medical Group, for follow up of peripheral neuropathy, a finding of a lung mass on a chest CT scan, depression and headaches. (R. at 886.) Fleenor reported that her depression had been stable since her last visit. (R. at 886.) Examination revealed that Fleenor was in no distress; she had a normal gait; she had normal movement in her extremities; and she had normal muscle strength and tone, but some diminished sensation in her extremities. (R. at 887.) On October 18, 2013, Fleenor complained of worsened depression and loss of energy. (R. at 883.) Dr. Louthan reported that Fleenor exhibited a depressed mood and affect, intact judgment and insight and normal speech. (R. at 884.)

On January 6, 2014, Fleenor reported ongoing headaches, anger spells and an episode of feeling like her heart had stopped. (R. at 1411.) She appeared anxious and depressed and admitted to suicidal and homicidal thoughts. (R. at 1413.) Her heart rate was elevated, but she was healthy appearing and in no acute distress, with normal rate and rhythm and normal heart sounds. (R. at 1412.) Dr. Louthan ordered a psychiatry consultation for major depression, single episode. (R. at 1413.) That same day, Fleenor saw Laura Duncan, L.M.S.W., a licensed master social worker with Frontier Health, for worsened mood instability and insomnia since discontinuing Chantix. (R. at 2082.) She also endorsed passive suicidal ideation at times and issues with anger and violence against significant others. (R. at 2082.)

Duncan reported that Fleenor was calm and cooperative and was not interested in any type of inpatient referral. (R. at 2082.)

On January 14, 2014, Jill Ann Wishart, L.C.S.W., a social worker with Frontier Health, saw Fleenor for intake. (R. at 2081.) Fleenor reported feeling angry and depressed. (R. at 2081.) Fleenor reported that she wanted to return to her education and enjoyed the idea of being a nurse. (R. at 2081.)

On January 30, 2014, Fleenor saw Dr. Louthan for follow up of polyneuropathy. (R. at 1400.) She presented in a wheelchair. (R. at 1401.) Physical examination showed decreased sensation bilaterally from the hips to the feet "with weakness." (R. at 1402.) Dr. Louthan diagnosed idiopathic peripheral neuropathy and herniated nucleus pulposus at the L4-L5 level. (R. at 1402.) On February 4, 2014, Wishart reported that Fleenor was socially appropriate; she had a mildly dysphoric mood and affect; she had good grooming; and she denied suicidal or homicidal ideations or hallucinations. (R. at 2080.) Fleenor presented in a wheelchair. (R. at 2080.) Wishart assessed Fleenor's then-current GAF score at 60. (R. at 2080.)

On February 5, 2014, Fleenor saw Dr. Douglas A. Wright, M.D., for evaluation of idiopathic peripheral neuropathy. (R. at 1267-75.) She reported episodes of lower extremity weakness in July 2010, July 2012, July 2013 and January 2014. (R. at 1269.) On examination, strength was generally 5/5 throughout, except for "giveaway weakness" in the lower extremities on confrontational testing. (R. at 1270.) Functional testing showed that Fleenor could stand without use of arms, lift weight and walk on her toes and heels. (R. at 1270.) The examination was variable, subject to distraction, especially when being watched without being

examined. (R. at 1270.) For instance, waiting room and parking lot walking was normal. (R. at 1270.) The discrepancy between confrontational and functional testing suggested "symptom amplification." (R. at 1270.) Fleenor's reflexes were intact; a Hoover's sign was positive, which indicated nonorganic limb weakness; and she had intact sensation, except monofilament testing was graded 0/7. (R. at 1270.) Dr. Wright felt that Fleenor's problem was vague and nonspecific. (R. at 1274.) He noted that Fleenor's symptoms were "somewhat atypical with signs of symptom amplification and nonorganic findings on the exam." (R. at 1274.)

On February 12, 2014, an EMG and nerve conduction study of the right upper and lower extremities showed normal findings. (R. at 1264-65.) On March 21, 2014, Fleenor reported improvement of her bilateral leg weakness, and she was able to walk, though she still complained of numbness in both legs and severe low back pain. (R. at 1257.) On examination, Fleenor had a positive Hoover's sign; she had full range of motion of the spine with no tenderness; her gait, posture and station were normal; and she had intact strength and range of motion throughout the extremities. (R. at 1258.) Dr. Wright noted that, despite repeated and extensive workups, no definitive neurological diagnosis had been made. (R. at 1260.) He concluded that there was nothing else to add from a neurologic standpoint. (R. at 1261.)

On March 21, 2014, Fleenor had a stable mood and calmer affect, and her grooming was described as "very attractive." (R. at 2079.) Fleenor's then-current GAF score was assessed at 65.[15] (R. at 2079.) On March 27, 2014, Fleenor complained of increased back pain with some "numb tingling feeling" and radiation

---

[15] A GAF score of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well ...." DSM-IV at 32.

into the legs intermittently. (R. at 1349.) On examination, Fleenor appeared
uncomfortable, but she exhibited normal strength and tone in all muscle groups
bilaterally; she had normal sensation throughout; her reflexes were within normal
limits bilaterally; her middle and lower spine was tender to palpation; and her heart
rate was within normal limits. (R. at 1351.) On April 9, 2014, an MRI of Fleenor's
lumbar spine showed mild degenerative disc disease at the L4-L5 and L5-S1 levels.
(R. at 1345-46.) An MRI of Fleenor's thoracic spine was normal. (R. at 1347-48.)
On April 18, 2014, Wishart reported that Fleenor had an enlivened mood and affect
and good grooming. (R. at 2078.) Her GAF score was assessed at 70. (R. at 2078.)

On May 27, 2014, Fleenor presented to the emergency room for complaints
of mild confusion and memory loss, with associated headache and weakness. (R. at
1489-94.) Fleenor's affect was flat, but she otherwise was neurologically intact, and
she had normal reflexes, tone and coordination. (R. at 1490.) A CT scan of Fleenor's
head was normal. (R. at 1493.) It was noted that Fleenor likely had a complex
headache with associated medication side effect. (R. at 1494.)

On June 4, 2014, Fleenor established care with Dr. Christopher M. Basham,
M.D., for evaluation of back pain. (R. at 1513, 1515.) Physical examination was
normal, as were Fleenor's mood, affect and behavior. (R. at 1515-16.)

On June 23, 2014, Fleenor saw Dr. Paul L. Jett, M.D., for evaluation of
chronic back pain with associated headaches, numbness, tingling and weakness. (R.
at 1509.) Fleenor stated that she had suffered a stroke the previous month and had
short- and long-term memory loss.[16] (R. at 1509.) She stated that she could not work

---

[16] The record does not contain any evidence indicating that Fleenor suffered a stroke.

but remained able to care for herself and perform household chores, shopping and hobbies. (R. at 1511.) On examination, Fleenor exhibited decreased range of motion and tenderness in the lumbar back; straight leg raising tests were negative; she had full muscle strength throughout the lower extremity muscle groups; she had intact sensation; and she had normal mood and affect, behavior, judgment and thought content. (R. at 1512-13.) Fleenor was referred to physical therapy. (R. at 1513.) She participated in three sessions of physical therapy, reporting increased pain. (R. at 1531.) Dr. Jett could find no explanation for the sensory deficits in Fleenor's lower extremities and ordered a lumbar MRI. (R. at 1536.) On August 5, 2014, during an examination with Dr. Basham, Fleenor reported that her symptoms improved with the addition of Neurontin. (R. at 1557.) Fleenor's physical and mental examinations were normal. (R. at 1558-59.) On August 8, 2014, an MRI of Fleenor's lumbar spine showed minor disc bulge at the L4-L5 level, which had decreased since 2010; the left-sided protrusion visualized in 2010 had since resolved; there was no residual stenosis and no nerve root compression; and very mild disc degeneration at the L5-S1 level with minimal disc bulging. (R. at 1537.)

On August 19, 2014, Fleenor established care with Dr. Uzma Ehtesham, M.D., a psychiatrist, for complaints of anger issues. (R. at 1543.) Examination showed a normal gait; fair hygiene and grooming; avoidance of eye contact; spontaneous speech; normal motor activity; hypomanic affect with congruent thought content and mood; fair insight; "impaired" reality testing, but no delusions; and goal-oriented thought process. (R. at 1543-44.) Dr. Ehtesham diagnosed bipolar 1 disorder, most recent or current episode, mixed, moderate. (R. at 1544.) On October 1, 2014, Dr. Ehtesham completed a mental status evaluation form, finding that Fleenor was depressed off and on, but that a mental status examination revealed that she was cooperative, alert and oriented; she had a sad mood and affect; her

memory was fair; she had no delusions, hallucinations or confusion; she had decreased concentration; and poor judgment. (R. at 1599-1603.)

On October 14, 2014, Dr. Ehtesham reported that Fleenor had a normal gait; fair hygiene and grooming; spontaneous speech; normal motor activity; anxious and agitated affect; congruent mood and thoughts; fair insight; intact judgment; improved reality testing; and goal-oriented thought processes. (R. at 1618-19.) Examinations with Dr. Ehtesham between November 2014 and February 2015 were nearly identical,[17] and Fleenor was prescribed various medications for her symptoms. (R. at 1612-17.)

On November 11, 2014, Dr. Basham reported that Fleenor had a normal neck range of motion; she had normal range of motion in her extremities; and normal psychiatric and neurological examinations. (R. at 1666.) That same day, Dr. Basham completed a mental assessment, finding that Fleenor had no limitations on her ability to relate to co-workers; to deal with the public; to use judgment in public; to interact with supervisors; to maintain personal appearance; and to behave in an emotionally stable manner. (R. at 1605-07.) He found that Fleenor had a satisfactory ability to understand, remember and carry out complex, detailed and simple job instructions. (R. at 1606.) Dr. Basham opined that Fleenor had no useful ability to follow work rules; to deal with work stresses; to function independently; to maintain attention and concentration; to relate predictably in social situations; and to demonstrate reliability. (R. at 1605-06.) Dr. Basham also completed a medical assessment, indicating that Fleenor could not lift or carry any weight; she could not walk or stand; she could sit for a total of eight hours in an eight-hour workday; she could never

---

[17] In November 2014, Fleenor's affect was anxious and constricted, and in January and February 2015, it was anxious. (R. at 1613, 1615, 1617.)

climb, stoop, kneel, balance, crouch or crawl; she had a limited ability to reach, to handle, to feel and to push/pull; and she was restricted from working around heights and moving machinery. (R. at 1609-11.) In both assessments, he opined that Fleenor would be absent from work more than two days a month. (R. at 1607, 1611.)

In February 2015, Dr. Ehtesham completed a mental assessment, indicating that Fleenor had a satisfactory to seriously limited ability to make occupational adjustments, and seriously limited to no useful ability to make performance and personal/social adjustments.[18] (R. at 1627-29.) She opined that Fleenor would be absent from work more than two days monthly. (R. at 1629.)

On March 30, 2015, Fleenor reported doing well. (R. at 1660.) On May 7, 2015, Fleenor reported that she was feeling happier following her recent divorce and since starting her medication. (R. at 1657.) Her mood, affect and behavior remained normal. (R. at 1659.) Dr. Basham ordered a Holter monitor for further evaluation of palpitations and encouraged smoking cessation.[19] (R. at 1659.)

On January 14, 2016, Crystal Burke, L.C.S.W., a licensed clinical social worker, reported that Fleenor was clean, neat and well-groomed; her mood was euthymic and her affect was appropriate; her eye contact was appropriate; her thought process was intact; and she had good judgment and insight. (R. at 1720-21.)

---

[18] Examinations with Dr. Ehtesham through October 2015 reveal that Fleenor had a normal gait; fair hygiene and grooming; normal motor activity; a euthymic mood; animated affect; fair insight and judgment; and goal-oriented thought processes. (R. at 1639, 1642, 1645, 1649, 1651-52.)

[19] It is unclear whether the study occurred. Following her divorce, Fleenor lost her health insurance coverage and stopped seeing Dr. Basham. (R. at 1732.)

Subsequent visits showed no significant changes in Fleenor's overall mental status, though, at times, she seemed mildly anxious and had racing thoughts. (R. at 1716.)

On March 4, 2016, Dr. Esther Ajjarapu, M.D., a physician with Appalachia Family, reported that Fleenor's cardiovascular and pulmonary examinations were normal; she had a normal gait; her motor examination revealed normal tone, bulk and strength; and she had appropriate judgment, good insight, intact recent and remote memory, a euthymic mood and appropriate affect. (R. at 1734.) Examinations with Dr. Ajjarapu between May and July 2016 showed that Fleenor had a normal gait; full motor strength; normal muscle tone and bulk; appropriate judgment; good insight; a euthymic mood; appropriate affect; and intact recent and remote memory. (R. at 2210, 2299, 2303.)

On April 7, 2016, Fleenor reported doing well and requested to discontinue some of her medications. (R. at 1723.) A depression screen on that day was normal, and she continued to exhibit a normal gait and intact mental status. (R. at 1725.)

On April 14, 2016, Burke completed a mental assessment, indicating that Fleenor had no, mild or satisfactory limitations in her ability to make occupational, performance and personal/social adjustments. (R. at 2198-2200.) She opined that Fleenor would be absent from work about two days a month. (R. at 2200.)

On April 22, 2016, Dr. Ehtesham completed a mental assessment, finding that Fleenor had a satisfactory ability to follow work rules; to relate to co-workers; to interact with supervisors; to function independently; to understand, remember and carry out detailed and complex job instructions; to maintain personal appearance; and to behave in an emotionally stable manner. (R. at 1737-39.) She found that

Fleenor had a seriously limited ability to deal with the public; to use judgment in public; to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out simple job instructions; to relate predictably in social situations; and to demonstrate reliability.[20] (R. at 1737-38.) Dr. Ehtesham opined that Fleenor would be absent from work more than two days a month. (R. at 1739.)

On April 27, 2016, Fleenor reported that she was excited about a new relationship and talked about a trip that she was planning with her ex-boyfriend. (R. at 2205.) She then became talkative about the many trips she had planned for the summer and was pleased to announce that she was not going to have to pay for anything, as her friends were going to support her as she traveled. (R. at 2205.) Fleenor stated that she kept a positive attitude, so that all she had been through did not affect her daily life. (R. at 2205.) Fleenor's mood was anxious, but her grooming, affect and eye contact were appropriate. (R. at 2206.) Judgment and insight were good, and thought process was goal-directed. (R. at 2207.)

On May 31, 2016, Fleenor reported that she was traveling in order to avoid being at home. (R. at 2202.) She described herself as a gypsy, stating that she had visited two different motorcycle groups in South Carolina on three different occasions in the past month. (R. at 2202.) She also reported trips to Washington, D.C., and Niagara Falls. (R. at 2202.) Burke reported that Fleenor appeared to have some manic behaviors with excessive goals and energy, decreased need for sleep, pressured speech and excessive travel. (R. at 2202.) Fleenor's mood was hypomanic, and her affect was elated. (R. at 2204.) Burke diagnosed bipolar disorder, current

---

[20] The court notes that these findings regarding Fleenor's ability to understand, remember and carry out job instructions are illogical.

episode mixed, unspecified; and histrionic personality disorder. (R. at 2204.) On June 30, 2016, Fleenor's musculoskeletal and cardiovascular findings were objectively normal on examination, and her mental status remained intact. (R. at 2303.)

On July 28, 2016, Fleenor arrived late to her appointment with Burke and with multiple somatic complaints, dressed in all black and a biker vest. (R. at 2294.) She expressed disappointment, as she could not hold up to motorcycle rides/trips due to back pain and leg numbness. (R. at 2294.) Fleenor reported recent financial stress due to overspending, and she reported going for days without sleep. (R. at 2294.) Burke noted that Fleenor's thoughts were scattered, and it was sometimes difficult to follow her storyline. (R. at 2294.) Fleenor's mood was mildly manic-irritable, her speech was normal for range and flow, and she exhibited fair insight. (R. at 2294.)

On August 9, 2016, Paige Cordial, Psy.D., evaluated Fleenor upon referral of Fleenor's attorney. (R. at 2310-22.) Cordial reported that Fleenor was talkative, but her speech was not pressured or disorganized; her mood was good, and her affect was congruent; she did not appear to be anxious at any point; and her intelligence was estimated to be average. (R. at 2310.) Fleenor reported that she attended a motorcycle ride the weekend prior to the evaluation and planned to attend another the weekend after. (R. at 2316.) She reported that she was sexually promiscuous and had over 15 partners in the past month. (R. at 2316.) Cordial diagnosed histrionic personality disorder; conversion disorder with mixed symptoms; bipolar II disorder, most recent episode depressed; and unspecified anxiety disorder. (R. at 2322.)

On August 11, 2016, Dr. Ajjarapu completed a medical assessment, indicating that Fleenor could lift and carry items weighing more than five pounds occasionally

and five pounds frequently; she could walk and/or stand a total of one hour in an eight-hour workday, and could do so for up to 25 minutes without interruption; she could sit for a total of 20 minutes in an eight-hour workday, and she could do so for up to 15 minutes without interruption; she could frequently climb stairs and balance; occasionally crouch and crawl; and never stoop or kneel; she had a limited ability to push/pull; and she was restricted from working around heights, moving machinery, pulmonary irritants and noise. (R. at 2306-08.) He opined that Fleenor would be absent from work more than two days a month. (R. at 2308.)

On August 23, 2016, Cordial completed a mental assessment, indicating that Fleenor had slight limitations in her ability to maintain personal appearance. (R. at 2324-26.) She opined that Fleenor had a satisfactory ability to follow work rules; to maintain attention and concentration; and to understand, remember and carry out detailed and simple job instructions. (R. at 2324-25.) Cordial found that Fleenor had a seriously limited ability to understand, remember and carry out complex job instructions. (R. at 2325.) She opined that Fleenor had no useful ability to make occupational and personal/social adjustments in the remaining categories. (R. at 2324-25.) Cordial found that Fleenor would be absent from work more than two days a month. (R. at 2326.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a

listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011 & Supp. 2019); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Fleenor argues that the ALJ's finding that she retained the functional capacity to perform a limited range of simple, low-stress, sedentary work with no more than

occasional interaction with the public and co-workers, is unsupported by the substantial evidence of record. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-9.) Specifically, she argues that the ALJ erred in his weighing of the opinion evidence of eight separate medical opinions. (Plaintiff's Brief at 9.) For the reasons that follow, I am not persuaded by Fleenor's arguments.

First, I find that the ALJ properly weighed the evidence related to Fleenor's mental health impairments before arriving at her mental residual functional capacity finding. The ALJ is not required to adopt a residual functional capacity assessment of a treating or examining physician in determining a claimant's residual functional capacity. Instead, the ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1546(c) (2019); *see also* 20 C.F.R. § 404.1527(d)(2) (2019) (a claimant's residual functional capacity is an issue reserved exclusively to the Commissioner). Furthermore, an ALJ is not bound to adopt a medical opinion in its entirety, even when he gives it significant weight. *See* 20 C.F.R. § 404.1527(d); *see also Hilliard v. Colvin*, 2016 WL 5415821, at *11 (W.D. Va. Sept. 27, 2016) (citing *Mays v. Barnhart*, 2003 WL 22430186, at *4 (3d Cir. 2003); *Titterington v. Barnhart*, 2006 WL 584277, at *4 (3d Cir. 2006) ("There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining a [residual functional capacity]")). The relevant question is whether the ALJ's residual functional capacity assessment is supported by the relevant evidence, including medical records, medical source opinions and the claimant's subjective allegations and description of her own limitations. *See* 20 C.F.R. § 404.1546(c).

As stated previously, the ALJ may assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings. These factors include (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by the medical evidence; (4) the opinion's consistency with the record as a whole; (5) the treating physician's specialization; and (6) any other factors which support or contradict the opinion. *See* 20 C.F.R. § 404.1527(c). Even opinions from a treating physician will be accorded significantly less weight if they are not supported by clinical evidence or if they are inconsistent with other substantial evidence. *See Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

In making this residual functional capacity finding, the ALJ stated that he was giving "little weight" to the mental assessments of Bogle, Lanthorn, Dr. Basham, Dr. Ehtesham and Cordial. (R. at 955-56.) The ALJ noted that Bogle's extreme limitations were inconsistent with the largely benign mental health findings documented throughout the relevant time period. (R. at 955.) The ALJ noted that, despite placing such extreme limitations on Fleenor, Bogle met with Fleenor only once monthly and did not indicate that she needed any more intensive outpatient treatment. (R. at 955.) Thus, the ALJ found that Bogle's conservative treatment course was at odds with the severe limitations he assessed. *See* 20 C.F.R. § 404.1527(c)(3), (4); *Hall v. Berryhill*, 2017 WL 4330356, at *6 (E.D. N.C. Sept. 29, 2017) ("an ALJ may discount an opinion where it is inconsistent with a conservative course of treatment"); *Tilley v. Colvin*, 2016 WL 775420, at *12 (D. Md. Feb. 29, 2016) ("'[i]t is entirely appropriate for an ALJ to consider a discrepancy between a treating physician's opinion and the provision of conservative treatment to address

a condition.'") (quoting *Norris v. Comm'r. Soc. Sec.*, 2014 WL 2612367, at \*4 (D. Md. June 9, 2014)).

In addition, Bogle's treatment notes contain no mental status examinations and few, if any, examination findings to support any of his assessed limitations. Bogle's treatment notes reflect that Fleenor was content with her life, (R. at 879); was in a "happy, bubbly mood," (R. at 878); was upset by a friend's remarks, (R. at 873); and had difficulty staying "in present moment." (R. at 877.) It is well-established that the mere memorialization of a claimant's subjective complaints in a medical record does not transform those subjective complaints into objective medical findings. *See Craig*, 76 F.3d at 590 n.2. Furthermore, Bogle indicated that the limitations set forth in his opinion were based entirely on Fleenor's own reports. (R. at 786-87.) An ALJ may give "significantly less weight" to a treating physician's "conclusory opinion based on the applicant's subjective reports." *Craig*, 76 F.3d at 590 n.2. This is especially true in a case such as this, where some of Fleenor's subjective reports are patently untrue.

The ALJ noted that Lanthorn's October 2011 opinion was based on a single evaluation, and his findings were not consistent with the mental health findings documented by Fleenor's treating providers. (R. at 759-61, 955.) The ALJ noted that, one week prior to Lanthorn's evaluation, an examination at Frontier Health revealed that Fleenor was oriented; she had a euthymic mood and congruent affect; she had clear and understandable speech; and no suicidal or homicidal ideations or hallucinations. (R. at 743, 955.)

The ALJ gave little weight to Dr. Basham's November 2014 mental assessment because he relied, partially, on Fleenor's alleged physical limitations,

which the ALJ found were not limiting to the degree alleged by Fleenor. (R. at 956, 1605-07.) In weighing the medical evidence, the ALJ noted that Fleenor's mental status examinations were normal and revealed that she was oriented; she had a mood that typically ranged from normal to euthymic; she had an appropriate affect; she made good eye contact; her speech was clear and goal-oriented; and she had good insight and appropriate judgment. (R. at 658, 693, 698, 717, 744, 746, 1218, 1237.) Neurological examinations at UVA showed that Fleenor was alert and oriented, she had an appropriate mood and affect, and she had normal behavior. (R. at 856, 861.) Dr. Wright reported that Fleenor had an appropriate mood and affect and intact recent and remote memory. (R. at 1269.) Between August 2014 and October 2015 Fleenor had fair hygiene and grooming; spontaneous speech; normal motor activity; normal thought content; fair insight; fair memory; no delusions, hallucinations or confusion; goal-oriented thought processes; and a mood that ranged from anxious to euthymic. (R. at 1544-48, 1601, 1613, 1615, 1617, 1619, 1639, 1642, 1645, 1649, 1651-52.)

The ALJ also gave "little weight" to Dr. Ehtesham's February 2015 and June 2016 mental assessments because they were not supported by the evidence of record. (R. at 955-56, 1627-28, 1737-39.) The ALJ gave "little weight" to the Cordial's August 2016 opinion. (R. at 956, 2324-26.) As noted by the ALJ, Dr. Ehtesham did not start treating Fleenor until August 2014, five months after her date last insured and Cordial's evaluation did not occur until nearly two and a half years after Fleenor's date last insured. (R. at 955-56.) The ALJ found that the "marked" and "extreme" limitations assessed by Dr. Ehtesham were inconsistent with the largely benign findings on mental status examinations, as well as Fleenor's conservative treatment. (R. at 955.) In addition, the ALJ stated that Cordial's opinion was devoid of any reference to persuasive evidentiary support for the period in question. (R. at

956.) Treatment notes from 2016 document some increased objective findings consistent with bipolar disorder, whereas the pre-date last insured evidence showed fairly normal clinical findings. (R. at 956.)

Mental status examinations consistently revealed that Fleenor was oriented and alert; she had a mood that ranged from anxious to normal and euthymic with a congruent affect; her speech was clear and understandable; she had good insight; her judgment was appropriate; and she had intact recent and remote memory. (R. at 650, 691-95, 698-99, 708, 711, 714, 717, 743, 766, 847, 861, 884, 1512, 1515-16, 1558-59, 1734, 2210, 2299, 2303.) In addition, Fleenor reported spending time with friends and family; she dated various people; she spent a lot of time on her computer; she did laundry, cooking and cleaning; she watched television; and she took numerous trips to motorcycle rallies, referring to herself as a gypsy. (R. at 693, 698, 743, 746, 752-53, 2202, 2205.) Furthermore, Fleenor reported feeling happier since starting medication. (R. at 1657.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ stated that he was giving "some weight" to the September 2012 functional capacity evaluation completed by nurse practitioner Brooks and giving "little weight" to the November 2014 assessment of Dr. Basham and the August 2016 assessment of Dr. Ajjarapu. (R. at 838-40, 952-54, 1609-11, 2306-08.) The ALJ recognized that Brooks was one of Fleenor's treating practitioners, and, as such, had a longitudinal picture of Fleenor's impairments. (R. at 952.) However, the ALJ also noted that Brooks's opinion was largely inconsistent with the normal and benign examination findings documented elsewhere in the record, including in Brooks's own treatment notes. (R. at 952.) *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the

more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion"); *see also Thompson v. Astrue*, 442 F. App'x 804, 808 (4th Cir. 2011) (explaining that where a treating physician's "opinion is not support by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.").

The ALJ explained that, in December 2010, Brooks documented grossly normal findings, and an examination in February 2011 revealed that Fleenor had a normal gait and station and normal sensation. (R. at 717, 720, 952.) During examinations with Brooks between March and May 2011, Fleenor complained of low back pain and difficulty walking, but her gait and station were normal, and she had normal sensation and normal psychological examinations. (R. at 698-99, 708, 711, 714, 717, 952.) In August 2012, Brooks described Fleenor's mood as happy; her speech was clear and easy to understand; she was dressed appropriately; and she made good eye contact. (R. at 829.) In October 2012, Brooks documented normal gait and station, cranial nerves and general appearance. (R. at 844.) In January 2013, Fleenor reported that she helped her brother care for his three-year-old daughter and had adopted a dog. (R. at 1235.) On examination, Fleenor was in no distress; she had a normal gait; appropriate judgment; good insight; and a euthymic mood and appropriate affect. (R. at 1236-37.) Examinations with Brooks in March and May 2013 were identical. (R. at 1219, 1231.) In August 2013, Fleenor complained of terrible headaches, but an examination revealed that she was awake, alert and in no distress; she had a normal gait; intact cranial nerves; appropriate judgment; good insight; a euthymic mood and appropriate affect; and intact and symmetric reflexes. (R. at 892-95.) The ALJ noted that Brooks's opinion was inconsistent with substantial evidence, including mild findings on diagnostic tests, normal physical examinations, negative neurological and rheumatological workups and Fleenor's

extensive activities of daily living, such as caring for her niece and nephew, traveling and attending motorcycle rallies. (R. at 952.) In May 2014, a CT scan of Fleenor's head was normal. (R. at 1493.) In August 2014, an MRI of Fleenor's lumbar spine showed minor disc bulge at the L4-L5 level, which had decreased since 2010; the left-sided protrusion visualized in 2010 had since resolved; there was no residual stenosis and no nerve root compression; and very mild disc degeneration at the L5-S1 level with minimal disc bulging. (R. at 1537.) Furthermore, the record also documents that Fleenor had exaggerated responses during examinations at Stone Mountain and that she engaged in symptom amplification. (R. at 658, 661, 1260, 1270.)

The ALJ gave Dr. Basham's November 2014 opinion "little weight" because it was unsupported by his own examination findings, as well as the other evidence of record. (R. at 953-54, 956, 1609-11.) In June 2014, Dr. Basham found that Fleenor had normal range of motion and a normal neurological examination. (R. at 1562.) In August 2014, Fleenor reported that her symptoms improved with the addition of Neurontin, and an examination again was normal and revealed normal range of motion. (R. at 1557-59.) In fact, Fleenor reported on several occasions that medication helped alleviate her pain. (R. at 696, 846, 1194, 1229, 1557.) *See Gross,* 785 F.2d at 1166. Examinations between November 2014 and May 2015 consistently revealed that Fleenor had normal neck range of motion; normal range of motion in her extremities; and normal neurological findings. (R. at 1654, 1659, 1661, 1666.) In June 2014, Dr. Jett reported that Fleenor had some tenderness in her lumbar spine with limitations in range of motion, but full muscle strength, negative straight leg raising tests bilaterally, normal muscle bulk and tone and intact sensation. (R. at 1512-13.)

The ALJ gave "little weight" to Dr. Ajjarapu's August 2016 opinion because the limitations assessed were unsupported by any medical evidence, and, instead relied almost entirely on Fleenor's subjective statements. (R. at 954.) In addition, Dr. Ajjarapu's treatment notes indicate that Fleenor had a normal gait; full motor strength; normal muscle tone and bulk; appropriate judgment; good insight; a euthymic mood; appropriate affect; and intact recent and remote memory. (R. at 1725, 1734, 2210, 2299, 2303.) A review of Dr. Ajjarapu's opinion reveals that her extreme limitations were based on Fleenor's own statements and reports. For example, Dr. Ajjarapu noted that "[p]atient says that if she can lift five pounds, she can. Anything greater than that causes her to fall on the floor," (R. at 2306); and "[p]atient says that she has to shift positions otherwise her legs fall asleep and she has lower back pain," (R. at 2307.) However, again, the mere memorialization of a claimant's subjective complaints does not transform them into objective medical findings. *See Craig*, 76 F.3d at 590 n.2. The ALJ also noted that Dr. Ajjarapu's opinion was inconsistent with the record, including diagnostic findings and physical examinations that documented intact motor strength and a normal gait. (R. at 954.) In addition, the ALJ noted that Dr. Ajjarapu did not start treating Fleenor until March 2016, two years after Fleenor's date last insured. (R. at 954, 1727.)

The ALJ gave "partial weight" to Dr. Blackwell's December 2010 opinion. (R. at 835, 952-53.) The ALJ explained that Dr. Blackwell's postural limitations were entitled to "limited weight" because they were not supported by his own examination findings and were contrary to other evidence. (R. at 953.) Dr. Blackwell noted that Fleenor's joints were normal, and she had intact strength throughout her extremities. (R. at 834-35, 953.) Although Dr. Blackwell noted that Fleenor had a somewhat unstable gait, (R. at 834, 953), the ALJ noted that numerous other physical examinations throughout the record document an intact gait, normal coordination

and intact strength. (R. at 953.) In August 2012, a rheumatological examination revealed no tenderness or swelling in Fleenor's shoulders, elbows, wrists, metacarpophalangeal joints, hips, knees, ankles or feet, and Fleenor had normal range of motion throughout. (R. at 799, 953.) Because Dr. Blackwell's postural limitations were unsupported by his own examination findings, as well as other record evidence, the ALJ assigned them little weight. (R. at 953.)

The ALJ assigned "limited weight" to Dr. Blackwell's postural limitation concerning Fleenor's ability to stoop because it was internally inconsistent. (R. at 953.) The ALJ noted that the term "stooping" means bending the body downward and forward by bending the spine at the waist. (R. at 953.) Dr. Blackwell opined that Fleenor could bend and kneel one-third of the workday, but also opined that she should avoid stooping. (R. at 835, 953.) The ALJ also noted that Dr. Blackwell did not explain why Fleenor could occasionally kneel, but never crawl. (R. at 953.) The ALJ largely agreed with Dr. Blackwell's assessment that Fleenor could perform a limited range of sedentary work. (R. at 953.) The ALJ limited Fleenor to frequent, rather than continuous, operation of foot controls, in light of the evidence documenting normal or only slightly reduced motor strength in the lower extremities. (R. at 953.) The ALJ explained that he gave Fleenor's subjective complaints the benefit of the doubt and assigned her slightly greater limitations with respect to her lifting and carrying abilities than assessed by Dr. Blackwell. (R. at 953.)

Based on this, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his finding that Fleenor had the residual functional capacity to perform a limited range of sedentary work.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence;

2. Substantial evidence exists in the record to support the ALJ's finding regarding Fleenor's residual functional capacity; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Fleenor was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Fleenor's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2018):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings

or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time at this time.

DATED:     January 29, 2020.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE